Natalie Marcin SBN# 351072
EarthSpotter
2801 B Street, Unit 2006
San Diego, CA 92102
Email: natalie@earthspotter.org
Telephone: (619) 320 5270

*Attorney for Plaintiff EarthSpotter*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EarthSpotter, a California non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>F.D.S. MANUFACTURING COMPANY, a California corporation,<br><br>Defendant. | Case No. 2:26-cv-8686<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.)** |

EarthSpotter ("Plaintiff") by and through counsel, hereby alleges:

## I. Jurisdiction and Venue

1. Plaintiff brings a civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA"). 33 U.S.C. § 1365. Under 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201, this Court has subject matter jurisdiction over the parties and this action.

2. On June 6, 2026, Plaintiff mailed a 60-day notice letter to F.D.S. MANUFACTURING COMPANY ("Defendant" or "FDS Manufacturing") as the owner and/or operator of the industrial manufacturing facility located at 2200 S Reservoir St, Pomona, California 91766 ("Facility"). The Notice Letter detailed the Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ)*, and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("Permit"). A true and correct copy of the Notice Letter and its enclosures is attached as **Exhibit 1** and incorporated herein.

3. Plaintiff mailed the Notice Letter via certified mail to the Facility's address, 2200 S Reservoir St Pomona, California 91766.

4. Pursuant to 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A), Plaintiff mailed the Notice Letter to (1) the Administrator of the Environmental Protection Agency ("EPA"), (2) the Regional Administrator of EPA Region IX, (3) the Executive Officer of the California State Water Resources Control Board ("State Water Board"), (4) the Executive Officer of the Los Angeles Regional Water Quality Control Board ("Regional Board"), and (5) Defendant's Agent for Service of Process.

5. More than sixty (60) days have passed since the Notice Letter was mailed to

the Defendant and the State and Federal agencies. On information and belief, neither the State nor Federal agencies has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and this Complaint. 33 U.S.C. § 1365(b)(1)(B). No previous administrative penalty issued under CWA Section 309(g) prevents this action from proceeding.

6. The violations occurred within the Central District of California. Thus, venue is proper under 33 U.S.C. § 1365(c)(1).

## II. <u>Introduction</u>

7. Plaintiff seeks relief for Defendant's substantive and procedural violations of the Permit and CWA occurring at the Facility.

8. Defendant has failed to follow numerous Permit provisions designed to prevent contaminated storm water from discharging into the Pomona Municipal Separate Storm Sewer System ("MS4"). The MS4 discharges into San Antonio Creek. Just over one mile downstream of the Facility's discharge point, San Antonio Creek feeds into Chino Creek, which flows into the Prado Basin and ultimately drains into the Santa Ana River. These downstream waters are collectively referred to as the "Receiving Waters."

9. This failure results in substantial impacts to (1) the flora, fauna, and ecology generally, and (2) the public, including EarthSpotter's members, who use the Receiving Waters to recreate.

10. Pollution from the Facility threatens the overall health of the Receiving Waters and, in turn, the plants and animals that depend on these habitats. When these natural systems are damaged, the public, including EarthSpotter's members, loses valuable recreational, educational, and scientific opportunities. Such contamination can also pose risks to human health. As a result, EarthSpotter's members are less inclined to visit or recreate near waters known to contain harmful metals, high nutrient levels, and other pollutants.

/./

## III. Parties

11. FDS Manufacturing is a California corporation that owns and/or operates the Facility.

12. EarthSpotter is a California non-profit public benefit corporation. EarthSpotter is committed to identifying environmental pollution and reducing its impacts on natural ecosystems—protecting clean water, air, and land, and addressing the effects of climate change on natural resources throughout California. In pursuit of its mission, EarthSpotter works to ensure compliance with environmental statutes, regulations, and other legal protections, including the CWA.

13. Plaintiff brings this action on behalf of its members. EarthSpotter's membership includes individuals who live, work, travel, and engage in recreational activities throughout Los Angeles and San Bernardino counties. Among them are members who were born and raised in the region and hold deep personal connections to its natural resources.

14. Plaintiff's members use and enjoy the Receiving Waters, along with the adjacent riparian, wetland, and beach areas, for recreational and aesthetic purposes, including wildlife observation. They are also dedicated to the protection, public education, and conservation of the ecosystems, including the species, wildlife, and habitats, that are affected by the quality of the waters into which Defendant's Facility discharges polluted storm water.

15. Given the ecological importance and aesthetic and recreational significance of the Receiving Waters, Plaintiff's members use and enjoy these waters and surrounding ecosystems and wetlands for a wide range of activities. They frequently visit various areas downstream from the Facility for fishing, hiking, biking, enjoyment of natural open spaces, general aesthetic appreciation, birdwatching, and observation of other fauna, including butterflies, fish, reptiles, and mammals. Plaintiff's members intend to continue all of the aforementioned

activities.

16. The discharge of storm water with elevated levels of pollutants from the Facility reduces Plaintiff's use and enjoyment of the Receiving Waters and the beaches and surrounding ecosystems into which they flow. Defendant's discharges diminish their ability to engage in recreational, aesthetic, restoration, conservation, and educational, pursuits in these downstream waters and ecosystems. Aware of the pollution concerns discussed herein, Plaintiff’s members avoid or limit activities such as swimming, fishing, kayaking, and other contact with the Receiving Waters when they would otherwise choose to participate. The discharge of pollutants, including toxic pollutants, harms aquatic life and riparian species that Plaintiff and its members observe, consume, and contemplate spiritually, while also degrading the ecosystems and habitats they work to protect and enjoy. Plaintiff’s members have a vested interest in healthy ecosystems and thriving natural flora and fauna populations, and their reduced use and enjoyment of the Receiving Waters is directly traceable to Defendant's pollutant-laden storm water discharges.

17. For example, one EarthSpotter member grew up in the Chino Hills area, still lives in the greater regional area, and has deep connections to the natural resources in the region. Growing up, this member regularly played golf at El Prado Golf Course, where they enjoyed viewing the Prado Basin and the flora and fauna that depend on it. They valued playing on a course so closely connected to the natural environment. While living in the area, they also regularly attended Verve City Church, located on Chino Creek. They still consider themselves a member of the church's community and intend to attend the church in the future. Similarly, they still visit Prado Regional Park, in general, to enjoy the flora and fauna.

18. This EarthSpotter member knows the Facility discharges pollutants just upstream of Chino Creek, and that knowledge has lessened their interest in golfing at El Prado and in otherwise enjoying the surrounding parkland. Their enjoyment of these places is diminished by their understanding that the Facility's discharges into

Chino Creek are harming the plant and animal life in the Basin. The same is true of their time at Verve City Church: whenever they see the Creek, they are mindful that the Facility's discharges are degrading water quality and injuring the wildlife that depends on it. They plan to continue golfing and enjoying the area's natural ecosystem going forward, and the Facility's ongoing pollution impairs their ability to do so. They also wish to obtain accurate and complete information, including information about the Facility’s operations, through the SMARTS database so they can track the pollution and potential sources.

19. The legal violations alleged in this Complaint cause direct injury to the recreational, aesthetic, restoration, conservation, educational, and professional interests of Plaintiff’s members. These injuries are concrete and particularized to Plaintiff’s affected members.

20. Unless the relief sought in this Complaint is granted, these interests have been, are being, and will continue to be adversely and irreparably harmed by Defendant's failure to comply with the CWA. Defendant's discharges of storm water with elevated pollutant levels are ongoing and will continue, as Defendant has not corrected the practices responsible for these violations. These injuries are actual, concrete, and traceable to Defendant's conduct, and redressable by the requested relief. If successful, this action will require Defendant to bring their discharges from the Facility into compliance with the CWA, thereby reducing pollutant discharges to the affected Receiving Waters and directly benefiting Plaintiff’s members by alleviating the harms they currently suffer.

21. Plaintiff’s members have an interest in accurate information regarding Defendant's discharges, Facility operations, and associated information. Defendant's failure to accurately report and monitor impedes Plaintiff's members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, educational, and spiritual purposes.

22. Plaintiff’s members have been deprived of rights to obtain complete and

accurate information regarding Defendant's compliance with the Facility's Permit and associated operations. These informational provisions of the Permit have been instituted by relevant regulatory agencies to protect the Waters of the United States.

23. As a result of failing to follow Permit provisions designed to protect the Receiving Waters, including accurate and complete information on SMARTS regarding Defendant's Facility operations and accurate and complete Facility monitoring, Plaintiff's members have suffered informational injuries.

24. The informational injuries result in Plaintiff's members being unable to assess the extent of the Facility's potential impact on the Receiving Waters, the levels and types of pollutants entering the Receiving Waters, and gauge the health and ecosystem ramifications, including to themselves, should they continue to recreate in the affected waterways.

25. An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiff.

## IV. Legal Background

26. The CWA prohibits the discharge of polluted storm water associated with industrial activity unless the discharger obtains a National Pollutant Discharge Elimination System ("NPDES") permit and complies with its terms. 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26(b)(14).

27. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

28. The Receiving Waters are Waters of the United States or tributaries thereof.

29. The CWA requires all storm water dischargers regulated under the CWA to achieve technology-based effluent limitations using the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)-(iii).

30. The CWA authorizes private citizens to sue to enforce the provisions of the

Permit. 33 U.S.C. § 1365(a)(1), (f)(6); *Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1139 (9th Cir. 1998).

31. The CWA allows states to administer their own EPA-approved NPDES permitting program, including storm water NPDES. The EPA has approved California's NPDES permitting program. The State Water Board issues these permits. Cal. Water Code § 13001.

32. The State Water Board issued a general NPDES permit for industrial manufacturing facilities, which is the Permit as described in Section I, *supra*. Before beginning operations, in most instances, a facility subject to the Permit that wishes to discharge storm water offsite must apply for coverage by submitting a Notice of Intent ("NOI") to the State Water Board to enroll under the Permit and comply with the Permit's terms. Permit § I.A.17.

33. Industrial manufacturing facilities with SICs 2679 and 3089 require Permit coverage. Permit, Attachment A.

A. <u>Discharge Prohibitions</u>

34. The Permit's discharge prohibitions prohibit (1) all storm water and non storm water discharges ("NSWDs") not specifically authorized by the Permit; (2) storm water discharges and NSWDs that "cause or threaten to cause pollution, contamination, or nuisance as defined in [S]ection 13050 of the Water Code;" and (3) "[d]ischarges that violate any discharge prohibitions contained in applicable [Regional Board] plans," among others. Permit § III.

35. Unauthorized NSWDs, such as spills, leaks, and dumping, must be eliminated through the "implementation of Best Management Practices" ("BMPs"). Permit § I.C.28.

36. Section 13050(k) of the Water Code defines "pollution" as the "alteration of the quality of waters" that adversely affects the receiving water's Beneficial Uses.

37. Section 13050(l) of the Water Code defines contamination as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard

to the public health through poisoning or through the spread of disease." The California Toxics Rule ("CTR") is an applicable water quality criteria in California promulgated to protect receiving water Beneficial Uses. The *Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California* Fact Sheet ("CTR Fact Sheet") explains that California "must use the criteria together with the State's existing water quality standards when controlling pollution in inland waters and enclosed bays and estuaries." Fact Sheet at 2. Thus, discharges that exceed the CTR cause or threaten to cause pollution, contamination, and nuisance.

38. The Water Quality Control Plan for the Santa Ana River Basin ("Basin Plan") prohibits toxic substances that "adversely affect [B]eneficial [U]ses." Basin Plan at 4-7. The CTR established criteria to protect the Beneficial Uses of California waters from toxic substances. Thus, exceeding CTR criteria constitutes a violation of the Basin Plan's toxicity limitation.

B. <u>Effluent Limitations</u>

39. The Permit requires dischargers to "implement BMPs [Best Management Practices] that comply with the" BAT for toxic and non-conventional pollutants and BCT for conventional pollutants. Permit § V.A.

40. Dischargers must implement BAT/BCT compliant BMPs to "reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability." Permit § V.A.

41. The EPA's *NPDES Storm Water Multi-Sector General Permit for Industrial Activities* ("MSGP")'s benchmarks ("EPA Benchmarks") and the Permit's Numeric Action Levels ("NALs") provide numeric objectives to evaluate pollutant discharges in storm water.

42. EPA Benchmarks and NALs indicate "if best management practices are effective and if additional measures are necessary to control pollutants."

Accordingly, exceedances of EPA Benchmarks and NALs indicate that the Facility has not implemented BMPs that comply with BAT and BCT standards. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

43. Failing to develop or implement BMPs that meet BAT and BCT standards violates Permit Section V.A. 33 U.S.C. § 1311(b); Permits § V.A.

C. Receiving Water Limitations

44. The Permit's Receiving Water Limitations ("RWLs") prohibit discharges that (1) "cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water," (2) "adversely affect human health or the environment," and (3) "contain pollutants in quantities that threaten to cause pollution or a public nuisance." Permit § VI.

45. The Santa Ana Basin Plan sets forth both narrative and numeric Water Quality Objectives ("WQO"), and the CTR establishes numeric criteria for toxic pollutants to protect Receiving Waters. These standards (1) prevent the degradation of the Receiving Waters' beneficial uses, (2) ensure that the pollutant concentrations do not impact human health or the environment, and (3) ensure that pollutant concentrations do not threaten to cause pollution or a nuisance. Basin Plan WQO and CTR criteria are applicable water quality standards, and exceedance of such is a violation of Permit RWLs VI.A, VI.B, and VI.C.

D. Storm Water Pollution Prevention Plan Requirements

46. The Permit requires that dischargers develop and implement a site-specific Storm Water Pollution Prevention Plan ("SWPPP") requirements and Monitoring Implementation Plan ("MIP") designed to reduce and prevent pollutants from contaminating storm water. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, develop and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and reduce or prevent the discharge of polluted storm water from industrial facilities. Permit § X.C.

47. The SWPPP should outline the necessary BMPs to meet BAT/BCT standards at the facility, based on site-specific conditions and pollutants, and must be revised as necessary to reflect any changes.

48. The SWPPP must include the following non-exhaustive elements:

(1) A narrative description and summary of all industrial activities, potential pollutant sources, and potential pollutants;

(2) A site map showing the stormwater conveyance system, discharge points, flow direction, nearby water bodies, and areas of industrial activities, among others;

(3) A description of storm water management practices;

(4) A description of the BMPs that will be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges;

(5) Procedures and BMPs for identifying and eliminating non-storm water discharges;

(6) The locations where significant materials are shipped, stored, received, or handled, including typical quantities and handling frequency;

(7) A description of dust- and particulate-generating activities;

(8) A list of the individuals responsible for developing and implementing the SWPPP, along with their current roles;

(9) A Monitoring and Implementation Plan ("MIP") that ensures compliance with the Permit including identifying monitoring tasks, discharge locations, visual observation and sampling procedures, justification for alternative discharge locations or sampling reductions if applicable, and an example chain of custody. The MIP also enumerates a team designated to implement the Permit requirements. Permit § X.A-I.

49. Dischargers must review their SWPPP at least once per year and update it as needed to remain in compliance with the Permit. Any significant revision to the SWPPP must be certified and submitted through Storm Water Multiple Application

& Report Tracking System ("SMARTS") within 30 days. Permit § X.A-I.

E. Monitoring and Reporting

50. The Permit requires the Facility to monitor storm water discharges through (1) monthly visual observations, (2) sampling event observations, and (3) sampling its storm water runoff. Permit § XI.

51. At least once per month, the Facility must inspect each drainage area for prior, current, or present unauthorized NSWDs, authorized NSWDs, and associated BMPs, and outdoor industrial activities and respective BMPs implementation. While sampling, the discharger shall observe whether the storm water had any floating or suspended materials, oil and grease, turbidity, odors, and potential sources of pollutants.

52. With respect to storm water sampling, a facility must collect four samples per reporting year: two during the first half of the reporting year (July 1–December 31) and two during the second half (January 1–June 30). If the facility participates in a compliance group, it is required to collect only one sample in each half of the reporting year (two total). All samples must be collected during a Qualified Storm Event ("QSE"). A QSE occurs when a precipitation event produces a "discharge for at least one drainage area; and . . . preceded by 48 hours with no discharge from any drainage area." The sample must be collected within four hours of the start of the discharge or the "start of the facility operations if the QSE occurs within the previous 12-hour period." Permit § XI.B.

53. The facility must monitor for (1) TSS, (2) oil and grease, (3) pH, (4) any SIC code specific parameters, (5) potential pollutants associated with the facility's industrial sources for which the Receiving Waters have 303(d) impairments or approved TMDLs, and (6) "identified by the [d]ischarger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment," among others. Permit § XI.B.6. All sampling results must be uploaded to SMARTS within thirty days of obtaining said results. Permit §

XI.B.11.

F. Annual Reporting

54. Each year, by July 15th, the discharger "shall certify and submit via SMARTS an Annual Report." The Annual Report shall include: (1) a compliance checklist indicating the facility complied with and "addressed all applicable requirements" of the Permit, (2) an explanation for any non-compliance, (3) any SWPPP amendments within the reporting year, and (4) the date of the Annual Evaluation. The Annual Evaluation consists of a single comprehensive review of the facility's storm water practices, including an assessment of the prior year's sampling, visual monitoring, and observation records; an inspection of the facility's industrial activities and associated potential pollutants; an examination of drainage areas; an evaluation of any new BMPs and related equipment; and a review of the overall effectiveness of the BMPs. Permit § XVI.

## V. Facts

55. The Defendant's Facility manufactures industrial and agricultural paper and plastic packaging products.

56. Defendant first filed an NOI on December 2, 2010. The Facility was issued the Waste Discharger Identification Number ("WDID") 4 19I022928.

57. The Defendant uploaded its most recent SWPPP and Site Map to SMARTS on November 26, 2025.

58. To effectuate its manufacturing, Defendant's Facility has indoor production, indoor storage, shipping and receiving, baler/compactor, outdoor storage, silos/bins, a maintenance shop, and operational equipment. The Defendant's Facility stores reclaimed plastic pellets in the southeastern corner and virgin plastic pellets in silos along the southern side of Building 1. SWPPP at 3.

59. Numerous industrial operations and materials at the Facility are located outdoors without sufficient roofing or other protection to keep storm water and non-storm water flows from contacting pollutant sources. In many areas, the Facility

also lacks proper secondary containment or other necessary treatment controls to stop contaminated storm water or non-storm water from leaving the site.

60. Pollutants generated indoors or beneath partial cover also routinely escape through wind dispersion, vehicle and foot traffic, and other pathways, spreading contamination throughout the Facility grounds. Pollutants from the Facility's industrial activities are, and have been, transported across the site and beyond its boundaries through tracking by vehicles and employees, wind, and storm water movement entering and exiting the property. As a result, employees, customers, and vehicles carry metals, nutrients, sediment, oil and grease, and other contaminants off-site.

A. <u>Discharge Prohibitions</u>

61. "Where consideration of a dilution allowance or mixing zone is not permitted by the water quality standards or is not appropriate, the relevant water quality criterion must be attained at the point of discharge." U.S. EPA's NPDES Permit Writer Manual § 6.2.3. On information and belief, the Facility does not have a dilution allowance or mixing zone, thus the Facility must meet applicable water quality objectives and criteria at the point of discharge.

62. Defendant's Facility has discharged and continues to discharge storm water that causes or threatens to cause pollution, contamination, and nuisance through exceeding applicable water quality objectives, criteria, benchmarks, and standards established to protect water quality, Beneficial Uses, human health, and the environment.

63. Defendant's Facility discharges, at minimum, COD, nitrogen, magnesium, zinc, and pH-affecting substances in excess of respective objectives and standards in violation of Permit Discharge Prohibition III.C. Exhibit 1. Discharging pollutants in excess of water quality objectives and standards designed to protect water quality pollutes the Receiving Waters, threatens their Beneficial Uses, and impacts human health and the environment.

64. Defendant's Facility has discharged and continues to discharge storm water in excess of CTR criteria in violation of Permit Discharge Prohibition III.D. Exhibit 1.

B. Effluent Limitations

65. Defendant has failed to develop adequate BMPs that comply with BAT/BCT technology.

66. Defendant's Facility's discharges exceed and continue to exceed NALs and EPA Benchmarks for COD, nitrogen, magnesium, zinc, and pH. Exhibit 1. Thus, sampling data indicates the Defendant has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements in violation of the Permit Effluent Limitation V.A. Based on the 2025 sampling results, the Facility has entered Level 1 status for COD and must complete a Level 1 Exceedance Response Action report.

67. Visual observations during the December 24, 2025 rain event confirm that Defendant fails to implement basic BMPs such as covering industrial materials or storing them under a shelter. For example, during the December 24, 2025 rain event, the Defendant left uncovered, in the rain, (1) industrial materials and products in various stages, (2) industrial waste, (3) equipment used to transport materials, (4) industrial tools, (5) plastic sheeting, and (6) uncontained chemical drums and containers. Further, the 2026 Level 1 Exceedance Response Action report indicates that broken asphalt tracking also occurs in drainage area 3. 2026 Level 1 ERA at Table 2.

68. On information and belief, the seals and caps on the operational equipment fail to be consistently inspected and maintained in good working condition. The lack of maintenance and inspections constitute a failure to implement BAT/BCT and an ongoing violation of Permit Section V.A.

69. Given the numerous Permit failures described in this pleading, the Facility has also failed to adequately train its employees, a required BMP.

/./

C. Receiving Water Limitations

70. The Receiving Waters are impaired, and thus unable to support designated Beneficial Uses, for some of the same pollutants discharged by the Facility. For example, Chino Creek is impaired for toxicity and nutrients, and San Antonio Creek is impaired for pH-affecting substances. The Facility discharges substances pollutants in excess of WQO and the CTR that impact these three impairments, namely zinc, nitrogen, and pH-affecting substances. These discharges cause or contribute to an exceedance of an applicable water quality standard in an affected waterbody in violation of Permit Section VI.A.

71. The Facility has discharged and continues to discharge zinc, nitrogen, and pH-affecting substances in excess of respective WQO and CTR criteria. These discharges (1) contain pollutants in quantities that threaten to cause pollution, and (2) adversely impact human health and the environment in violation of Permit RWLs VI.B and VI.C.

D. SWPPP

72. Defendant operates the Facility under a SWPPP that is inadequately developed and implemented.

73. The Defendant's SWPPP fails to provide an adequate narrative regarding industrial processes in violation of Permit Section X.G.1.a. The SWPPP mentions plastic products manufacturing but omits or lacks meaningful narrative for the remaining manufacturing processes. For example, the SWPPP glosses over the paper manufacturing process, and omits the printing, wax paper coating, and padding, among others. Manufacturing such products inherently requires different processing than plastic manufacturing, thereby failing to elucidate all industrial processes.

74. The Defendant's SWPPP fails to list all industrial materials onsite including locations where the material is stored, received, shipped, handled, and the typical frequencies and quantities in violation of Permit Section X.F. In particular, the

SWPPP lacks completeness. For example, the Industrial Materials table omits paper and other materials used in manufacturing and uses. Similarly, waste manifests support an array of industrial materials onsite not listed in the SWPPP.

75. The Defendant's SWPPP fails to provide an adequate associated pollutant assessment for its activities in violation of X.G.2. In particular, the SWPPP fails to identify all potential pollutants. EarthSpotter's storm water sampling indicates that the Facility discharges nitrogen, magnesium, and zinc in excess quantities, linked to its industrial operations, such as plastic packaging manufacturing (zinc and magnesium), chemicals associated with injection molds (magnesium and nitrogen), and pneumatic systems' gas (nitrogen). Nonetheless, the Facility fails to identify these associated pollutants and include the parameters in the MIP.

76. The Defendant's SWPPP fails to provide site-specific BMPs and the associated narrative in violation of Permit Section X.H and X.C.b. For each BMP, the Facility must identify the pollutant that BMP is designed to reduce, the frequency or conditions when implemented, location, person responsible, equipment and tools necessary for the BMP, and procedures and instructions for the BMP. In particular, the SWPPP lacks specificity. For example, the Facility contains a list of conclusory statements such as "[o]utdoor conveyance systems for Plastic Materials will be maintained in good operating condition." Nonetheless, the Facility does not elaborate on this conclusory statement, such as identifying how often the pneumatic seals and caps are inspected and replaced, a common leak source for such equipment. Indeed, the SWPPP lists numerous conclusory statements without elaboration. Similarly, there are inconsistencies between the conclusory statements and the associated Tables. For example, the SWPPP states that "all material stored outdoors are covered to prevent exposure to rain water." Not only is this not true, but tarps are not listed as equipment required for good housekeeping. This casts doubt on the numerous conclusory claims.

77. The Defendant's SWPPP fails to elaborate on dust generating sources in

violation of Permit Section X.G.1.c. In particular, the SWPPP fails to identify the characteristics of all potential dust and particulate generating sources and the industrial areas and activities associated. Although the SWPPP does mention a plastic grinder, other dust generating sources occur onsite and the SWPPP lacks all requisite information for the grinder.

78. The Defendant's SWPPP fails to upload an adequate Site Map in violation of Section X.E. The Site Map fails to contain all required elements. For example, it fails to delineate significant outdoor industrial storage, clearly show the drainage areas, and identify dust generating sources.

79. The Defendant's SWPPP fails to contain an adequate MIP in violation of Permit Section X.I. The MIP fails to identify the discharge location out the southwest driveway.

80. The Defendant's SWPPP fails to adequately develop a pollution prevention team in violation of Permit Section X.D.1. While the SWPPP identifies positions and responsibilities, it seems to deem the entire staff responsible for the Permit. The Permit contemplates designating specific members, simply writing "all employees" for such a Facility, undermines the policy behind Permit Section X.D.1.

81. The Defendant has failed to update the Facility's SWPPP in accordance with the requirements of the Permit. The Permit mandates that any substantial SWPPP modification be kept onsite and submitted to SMARTS within thirty days. However, despite the Facility's elevated pollutant levels in storm water discharges and its extensive outdoor storage practices, the SWPPP has remained unchanged. Indeed, according to the SWPPP revision log, the only change between 2018 and 2025 was an update of the Legally Responsible Person.

82. The SWPPP relies on a version of the Permit that predates the 2018 amendments (Order 2018-0028-DWQ) and fails to incorporate them. For example, the SWPPP cites the Permit's footnote 12, which the 2018 amendments renumbered to footnote 14, demonstrating that the SWPPP was not updated to reflect the

current, amended Permit. This bolsters the claim that the Facility fails to meaningfully revise the SWPPP on an ongoing basis.

E. Monitoring and Reporting

83. Defendant operates the Facility with an inadequate MIP.

84. Defendant fails to conduct adequate monitoring and reporting at the Facility.

85. The Defendant has failed and continues to fail to collect and analyze its storm water discharges for all parameters required by the Permit. EarthSpotter's sampling results demonstrate that the Facility releases excessive concentrations of zinc, magnesium, and nitrogen attributable to its industrial activities, such as residue on the recycled plastic, additives in the plastic like colors or chemicals, pneumatic system gases, and chemicals used for the injection molds, among others. Nonetheless, the Defendant fails to sample for these parameters. The Receiving Waters are impaired for some of these parameters (like nutrients).

86. Further, the Defendant did not begin sampling for COD until 2025, despite listing COD as an associated pollutant in the 2018 SWPPP and still fails to list COD as an analyte in its MIP.

87. The Defendant has failed, and continues to fail, to collect the required four storm water samples each Reporting Year. Indeed, the Regional Board issued a Notice of Violation for failing to comply with water sampling requirements in the 2024-2025 reporting year. Nonetheless, during the 2025-2026 reporting year, the Facility only collected one sample.

88. The Defendant's MIP fails to identify the discharge location at the southwestern driveway. On December 24, 2025, EarthSpotter's representative observed storm water discharging from that driveway, confirming it is a discharge point that the Defendant's site map fails to clearly identify (Permit Section X.E.3.b) and that the Facility does not sample. The Defendant's failure to sample and monitor discharges at this location violates the Permit's monitoring requirements, including Section XI.B, and the Defendant has not justified any alternative

discharge location or sampling reduction as Permit Section X.I.3 requires.

89. The Defendant fails to justify excluding the employee parking lot from sampling and monitoring. Although the Defendant asserts the parking lot has no exposure to industrial activity, it offers only a conclusory statement, not the documentation Permit Section X.G.2.c requires to identify a drainage area as having no exposure. Absent that justification, the Defendant cannot establish that the employee parking lot is exempt from the sampling obligations the Permit imposes.

90. The Defendant has failed to implement BMPs sufficient to prevent the discharge of pollutants. As a result, the Defendant has also failed to conduct adequate monitoring as required by the Permit, including performing the required monthly visual observations of BMPs implementation. Similarly, the Defendant has failed to properly train its employees on the Permit in light of the failure to identify the numerous violations in this pleading.

F. Annual Reports

91. The Defendant has submitted multiple Annual Reports, each accompanied by certifications asserting that the Facility was in full compliance with numerous Permit terms.

92. As outlined in this pleading, the Defendant has violated—and continues to violate—numerous provisions of the Permit for which the Facility claims compliance such as adequate monitoring. Thus, these certifications are erroneous and the Facility's Legally Responsible Person or Duly Authorized Representative should have known the Facility failed to comply with Permit requirements and these certifications were false.

93. The Facility's Duly Authorized Representative, Jason Wernli, submitted inaccurate Annual Reports to SMARTS on July 15, 2026; June 19, 2025; July 19, 2024; July 11, 2023; and July 11, 2022. Jason Wernli knew or should have known of these inaccuracies.

94. Defendant's 2026 Annual Report indicates that Defendant did not collect the required number of storm water samples due to lack of qualifying events. As discussed in Paragraphs 87-89, and Exhibit 1, NOAA Data, on information and belief, this is not true.

95. Defendant's 2026 Annual Report states that nutrients and zinc are not present at the Facility. As discussed in Paragraphs 75 and 85, and Exhibit 1, this is not true.

96. Defendant's 2025 Annual Report indicates that Defendant did not collect the required number of storm water samples due to lack of qualifying events. As discussed in Paragraphs 87-89, and Exhibit 1, NOAA Data, on information and belief, this is not true. Indeed, the Facility received a notice of violation from the Regional Waterboard on May 15, 2025 regarding the failure to collect the required samples.

97. Defendant's 2025 Annual Report states that nutrients and zinc are not present at the Facility. As discussed in Paragraphs 75 and 85, and Exhibit 1, this is not true.

98. Defendant's 2024 Annual Report indicates that Defendant did not collect the required number of storm water samples due to lack of qualifying events. As discussed in Paragraphs 87-89, and Exhibit 1, NOAA Data, on information and belief, this is not true.

99. Defendant's 2024 Annual Report states that nutrients and zinc are not present at the Facility. As discussed in Paragraphs 75 and 85, and Exhibit 1, this is not true.

100. Defendant's 2023 Annual Report indicates that Defendant did not collect the required number of storm water samples due to a "sampling frequency reduction." A sampling frequency reduction does not permit a singular sample, thus, this statement is not true.

101. Defendant's 2023 Annual Report states that nutrients and zinc are not present at the Facility. As discussed in Paragraphs 75 and 85, and Exhibit 1, this is not true.

102. Defendant's 2022 Annual Report states that nutrients and zinc are not present at the Facility. As discussed in Paragraphs 75 and 85, and Exhibit 1, this is

not true.

103. The Facility's failure to meet the Permit's reporting obligations places the Facility in ongoing, daily noncompliance with the Permit.

## VI. Claims for Relief

### FIRST CAUSE OF ACTION

**The Facility discharges contaminated storm water in violation of the Discharge Prohibitions and CWA.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

104. The foregoing allegations are incorporated herein by reference.

105. Defendant is a responsible party under the CWA.

106. Defendant has discharged and continues to discharge contaminated storm water in violation of Permit Section III.C.

107. Defendant has discharged and continues to discharge contaminated storm water that causes or threatens to cause pollution, contamination, or nuisance in the Receiving Waters in violation of Permit Section III.D.

108. Defendant has been in violation of Permit Sections III.C and III.D since at least June 6, 2021. Defendant's violations are ongoing and continuous.

109. Each time storm water discharges from the Facility in violation of each Permit provision constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

110. For each violation of Permit Sections III.C and III.D, the Defendant is subject to civil penalties.

### SECOND CAUSE OF ACTION

**The Facility fails to implement BMPs that comply with BAT/BCT technology.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

111. The foregoing allegations are incorporated herein by reference.

112. Defendant is a responsible party under the CWA.

113. Defendant has failed and continues to fail to reduce or prevent contaminating

storm water through BAT/BCT compliant BMPs in violation of Permit Section V.A.

114. Defendant has been in violation of Permit Section V.A since at least June 6, 2021. Defendant's violations are ongoing and continuous.

115. Each day the Facility operates without developing BAT/BCT compliant BMPs constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

116. Each day the Facility operates without implementing BAT/BCT compliant BMPs constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

117. For each violation of Permit Section V.A, the Defendant is subject to civil penalties.

## THIRD CAUSE OF ACTION

**The Facility discharges contaminated storm water in violation of the Receiving Water Limitations and CWA.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

118. The foregoing allegations are incorporated herein by reference.

119. Defendant is a responsible party under the CWA.

120. Defendant has discharged and continues to discharge contaminated storm water in violation of Permit Section VI.A.

121. Defendant has discharged and continues to discharge contaminated storm water in violation of Permit Section VI.B.

122. Defendant has discharged and continues to discharge contaminated storm water in violation of Permit Section VI.C.

123. Defendant has been in violation of Permit Sections VI.A, VI.B, and VI.C since at least June 6, 2021. Defendant's violations are ongoing and continuous.

124. Each time storm water discharges from the Facility in violation of each Permit provision constitutes separate and distinct violations of the Permit and

Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

125. For each violation of Permit Section VI.A, VI.B, and VI.C, the Defendant is subject to civil penalties.

## FOURTH CAUSE OF ACTION

**The Facility fails to develop and implement an adequate SWPPP and MIP.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

126. The foregoing allegations are incorporated herein by reference.

127. Defendant has failed and continues to fail to develop an adequate SWPPP in violation of Permit Section X.

128. Defendant has failed and continues to fail to implement an adequate SWPPP in violation of Permit Section X.

129. Defendant has failed and continues to fail to revise the SWPPP in violation of Permit Section X.

130. Defendant has failed and continues to fail to develop and implement an adequate MIP in violation of Permit Section X.

131. Defendant has been in violation of Permit Section X since at least June 6, 2021. Defendant's violations are ongoing and continuous.

132. Each day the Facility operates without developing an adequate SWPPP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

133. Each day the Facility operates without implementing an adequate SWPPP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

134. Each day the Facility operates without revising the SWPPP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

135. Each day the Facility operates without developing the MIP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33

U.S.C. § 1311(a).

136. For each violation of Permit Section X, the Defendant is subject to civil penalties.

**FIFTH CAUSE OF ACTION**

**The Facility fails to conduct adequate monitoring and reporting.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

137. The foregoing allegations are incorporated herein by reference.

138. Defendant has failed and continues to fail to conduct adequate monthly monitoring in violation of Permit Section XI.

139. Defendant has failed and continues to fail to collect the required number of storm water samples, from each discharge point, in violation of Permit Section XI.

140. Defendant has failed and continues to fail to analyze its storm water samples for all required constituents in violation of Permit Section XI.

141. Defendant has been in violation of Permit Section XI since at least June 6, 2021. Defendant's violations are ongoing and continuous.

142. Each failure to adequately monitor constitutes a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

143. For each violation of Permit Section XI, the Defendant is subject to civil penalties.

**SIXTH CAUSE OF ACTION**

**The Facility fails to submit accurate annual reports.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

144. The foregoing allegations are incorporated herein by reference.

145. Defendant has failed and continues to fail to submit accurate Annual Reports in violation of Permit Section XVI.

146. Defendant has failed and continues to fail to submit accurate Annual Reports in violation of Permit Sections XXI.K and XXI.L.

147. Each day the Facility operates without accurate Annual Reports is a separate

and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

148. Defendant has been in violation of Permit Section XVI since at least June 6, 2021. Defendant's violations are ongoing and continuous.

149. Defendant has been in violation of Permit Section XXI.K-L since at least June 6, 2021. Defendant's violations are ongoing and continuous.

150. For each violation of Permit Sections XVI and XXI.K-L, the Defendant is subject to civil penalties.

## VII. <u>Relief Request</u>

151. Plaintiff respectfully requests the Court grant the following relief:

(1) A court order declaring Defendant in violation of Sections 301(a) and (b) of the CWA for discharging pollutants in violation of the Permit.

(2) A court order enjoining Defendant from discharging pollutants in violation of the CWA and Permit.

(3) A court order requiring Defendant to implement injunctive measures that rectify Defendant's procedural and substantive violations of the CWA and Permit.

(4) A court order assessing civil penalties for the aforementioned violations at $68,446 per day per CWA violation that occurred after November 2, 2015 and assessed on or after January 9, 2025.

(5) A court order awarding reasonable fees and costs to Plaintiff including attorney fees and witness fees pursuant to Section 505(d) of the CWA.

(6) Any other relief the Court deems appropriate.

/./.

/./.

/./.

/./.

/./.

Date: August 6, 2026

Respectfully,

EarthSpotter

By: /s/Natalie Marcin
Natalie Marcin
Attorney for Plaintiff
EarthSpotter
Email: natalie@earthspotter.org